Randall WALDON, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A05–9609–CR–366.

Court of Appeals of Indiana.

Aug. 5, 1997.

Transfer Denied Sept. 19, 1997.

Pequita Jay Buis, Indianapolis, for Appellant–Defendant.

Pamela Carter, Attorney General, Suzann Weber Lupton, Deputy Attorney General, Indianapolis, for Appellee–Plaintiff.

## OPINION

SHARPNACK, Chief Judge.

Randall Waldon appeals his conviction for stalking, a class B misdemeanor. Waldon raises two issues for our review which we restate as:

1) whether there was sufficient evidence to support his conviction; and

2) whether he received ineffective assistance of counsel.

We affirm.

The facts most favorable to the conviction follow. In April of 1993, Waldon married Val Majors, and they had a son. During the marriage, Majors worked as a nurse and taught classes at a dance studio. In Novem-

ber of 1994, Waldon and Majors divorced, stipulating to a mutual restraining order.

On the morning of December 5, 1994, Majors was driving home from the dance studio when she encountered Waldon. Waldon was walking down the street about two blocks away from the studio. Majors was fearful and alarmed to find Waldon so close to the studio.

On the morning of August 16, 1995, Majors again saw Waldon as she was leaving the parking lot of the studio. Waldon was walking at a "hurried" rate toward the entrance of the parking lot. Record, p. 146. Majors was intimidated and threatened by Waldon's actions.

On evening of August 20, 1995, Majors was leaving work from the hospital when she saw Waldon standing near the parking lot. He stood about twenty-five feet away from Majors and stared at her. Although Waldon did not approach her, Majors was frightened by him.

A few days later, Majors again saw Waldon near her studio. As Majors was getting into her car, Waldon walked slowly by her. Majors grew more fearful of her encounters with Waldon.

On the morning of November 1, 1995, Majors was getting into her car in the studio parking lot when she noticed Waldon staring at her through a fence about four feet away. Majors became very frightened and ran back to the studio. She then called the police and filed a report.

On the evening of November 7, 1995, Majors was teaching a dance class when she saw Waldon outside of the studio. Waldon was riding his bike around a dumpster in the parking lot. When the class ended, Majors was afraid to walk alone to her car, so she had a friend escort her. As Majors was leaving the parking lot, Waldon rode his bike in front of her car. Majors felt threatened by Waldon's actions.

On December 14, 1995, the State charged Waldon with stalking. After a trial on March 7, 1996, the jury found Waldon guilty as charged. The trial court later sentenced Waldon to six months. Waldon now appeals his conviction.

## I.

The first issue raised for our review is whether there was sufficient evidence to support Waldon's conviction for stalking. When reviewing sufficiency claims, we neither reweigh the evidence nor judge the credibility of the witnesses. *Brewer v. State,* 646 N.E.2d 1382, 1386 (Ind.1995). Instead, we consider only the evidence which supports the conviction and all of the reasonable inferences drawn therefrom. *Perry v. State,* 638 N.E.2d 1236, 1242 (Ind.1994). We will affirm the conviction when there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt. *Brewer,* 646 N.E.2d at 1386. The testimony of a single witness is sufficient to sustain a conviction even when that witness is the victim. *Taylor v. State,* 614 N.E.2d 944, 948 (Ind.Ct.App.1993), *trans. denied.*

Waldon was convicted under Ind.Code § 35–45–10–5(a), which provides that a "person who stalks another person commits stalking, a Class B misdemeanor." Stalking is defined as:

> "[A] knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened."

I.C. § 35–45–10–1.

Waldon argues only that the State failed to present sufficient evidence that his encounters with Majors caused her emotional distress. Waldon asserts that based on Majors' testimony, "the jury could not have reasonably inferred that Ms. Majors actually felt terrorized, intimidated or threatened by Mr. Waldon during these six encounters." Appellant's brief, p. 14.

However, the record belies Waldon's assertion. During the trial, Majors testified that when she first saw Waldon near her studio, she became "fearful" and "alarmed." Record, p. 141. When Majors again saw Waldon near her studio, she felt intimidated and threatened. Next, when Majors encountered

Waldon in the parking·lot of the hospital, she was "afraid." Record, p. 149.

A few days later, when Majors saw Waldon near her studio, she suffered emotional distress. Majors described her distress as follows:

"It makes you feel like you don't have a life, like you're violated, like you have to go, you know, hurry and lock your doors, look around, scan the parking lot. It's like you can't go through a normal routine. You can't even go to work. It's frustrating. It's a violation and makes you fearful about what the intent is."

Record, p. 152.

Majors further testified that "the most frightening" encounter with Waldon occurred outside of the studio. Record, p. 155. When Majors was getting into her car, she saw Waldon peering at her through a fence. Majors stated that she was "frightened because [she] was so vulnerable" and that the experience "was very upsetting." Record, p. 155. A week later, Majors had her last encounter with Waldon near the studio. Again, Majors felt threatened and intimidated by Waldon's actions.

Contrary to Waldon's assertion, Majors testified that each of her encounters with Waldon caused her emotional distress. Based on her testimony, we find evidence of probative value from which the jury could conclude that Waldon caused her "to feel terrorized, frightened, intimidated, or threatened." I.C. § 35–45–10–1; *see Taylor,* 614 N.E.2d at 948. Therefore, the evidence was sufficient to support Waldon's conviction for stalking. *See Brewer,* 646 N.E.2d at 1386.

## II.

The final issue for our review is whether Waldon received ineffective assistance of counsel. In reviewing such a claim, we apply a two step analysis. *Sparks v. State,* 499 N.E.2d 738, 739 (Ind.1986). First, we determine whether the acts or omissions of counsel were outside the wide range of professionally competent assistance. *Id.* If so, we then determine whether such·acts or omissions prejudiced the defendant. *Sulie v. State,* 522 N.E.2d 380, 384 (Ind.1988), *reh'g*

*denied.* To establish prejudice, the defendant must affirmatively prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Averhart v. State,* 614 N.E.2d 924, 930 (Ind.1993) (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80.L.Ed.2d 674 (1984)), *reh'g denied.*

Upon review of a claim of ineffective assistance of counsel, we measure counsel's performance against a "reasonably effective assistance" standard. *Burr v. State,* 492 N.E.2d 306, 307–308 (Ind.1986). The defendant has the burden of overcoming the presumption of competence by showing strong and convincing evidence. *Id.* at 308. Our scrutiny is deferential and should not be distorted by hindsight; isolated poor strategy or bad tactics do not imply ineffectiveness. *Id.*

Waldon argues that defense counsel was ineffective for failing to cross-examine Majors and for failing to present evidence. We will address each challenge in turn.

### A.

■ Waldon asserts that defense counsel was ineffective for failing to cross-examine Majors because "the jury would have likely weighed her testimony with less credibility." Appellant's brief, p. 16. We disagree.

■ It is well settled that the nature and extent of cross-examination is a matter of strategy delegated to trial counsel. *Osborne v. State,* 481 N.E.2d 376, 380 (Ind.1985); *Robles v. State,* 612 N.E.2d 196, 198 (Ind.Ct. App.1993). Typically, when reviewing a claim of ineffective assistance, the first step is·to examine counsel's performance to determine whether it was outside the wide range of professionally competent assistance. ·*See Sparks,* 499 N.E.2d at 739. However, we need not conduct this step because Waldon has clearly failed to establish the second step, that such deficient performance prejudiced his case. *See Sulie,* 522 N.E.2d at 384.

In his·brief, Waldon has shown no favorable testimony which could have been elicited from Majors on cross-examination. *See Fine v. State,* 490 N.E.2d 305, 309 (Ind.1986)

(holding that there was no showing of prejudice by counsel's failure to cross-examine "key state's witnesses" when defendant failed to establish that counsel could have elicited favorable testimony). As a result, Waldon cannot establish that the trial would have been different, "but for counsel's unprofessional errors." *Averhart,* 614 N.E.2d at 930. Therefore, because Waldon has not shown that he was prejudiced, we cannot conclude that he received ineffective assistance of counsel. *See Sulie,* 522 N.E.2d at 384.

### B.

■ Lastly, Waldon contends that defense counsel was ineffective for failing to present any evidence. Waldon asserts that counsel's "lack of effort ... constituted a performance below the objective standard of reasonableness." Appellant's brief, pp. 15–16. We disagree.

■ For a claim of ineffective assistance to be premised on counsel's failure to present evidence, it must be shown that such evidence existed and was reasonably available. *Forehand v. State,* 479 N.E.2d 552, 556 (Ind. 1985). Here, Waldon does not allege; and the record does not disclose, the existence of any favorable evidence. As such, Waldon has failed to overcome the presumption of counsel's competence by showing strong and convincing evidence. *See Burr,* 492 N.E.2d at 308. Accordingly, Waldon has not demonstrated that he received ineffective assistance of counsel. *See id.*

For the foregoing reasons, we affirm Waldon's conviction in all respects.

Affirmed.

RUCKER, J. concurs.

BARTEAU, J., dissents with opinion.

BARTEAU, Judge, dissenting.

I respectfully dissent from the majority's conclusion that the evidence was sufficient to sustain Waldon's stalking conviction.

In support of the stalking charge, the State presented evidence that six times during a one year time span Majors observed Waldon in various degrees of proximity to herself. Majors first observed Waldon in December of 1994. Majors was driving her car when she observed Waldon walking down a street within two blocks of Majors' Broad Ripple dance studio. No eye contact, gestures or threats occurred. The second observation occurred eight months later on August 16, 1995. Majors was again driving her car when she observed Waldon walking in the parking lot of a business adjacent to the dance studio. As before, no eye contact, gestures or threats occurred. The third sighting occurred on August 20, 1995, with Majors again driving her car. She observed Waldon on the sidewalk outside of the Methodist Hospital Emergency room where Majors worked on a part-time basis. No words were exchanged and no gestures made, but this time Waldon looked at Majors with what Majors described as an "innocent" look. R. 148. The fourth sighting occurred on August 22, 1995. Majors was driving her car and observed Waldon walking slowly in a direction away from the dance studio. No eye contact was made. The fifth observation occurred on November 1, 1995. Majors was leaving her dance studio and headed toward her car when she observed Waldon peering at her through a slatted fence. There was eye contact and Waldon was smoking and appeared menacing to Majors. She returned to her studio and called the police. The final incident occurred on November 7, 1995 when Majors observed Waldon from the second story window of her dance studio. He was riding a bicycle around a dumpster in the parking lot of an adjacent business. There were no looks exchanged nor any threats conveyed.

Each time Majors observed Waldon, Waldon was in a public place. The dance studio is located in Broad Ripple, where pedestrian traffic is quite common. According to Majors, other businesses located in the immediate vicinity of the dance studio include a veterinarian's office, a pool supply company, a perfume shop, a hair salon, a tanning shop and a business called "The Whistle Stop." When Waldon was observed in the vicinity of the dance studio he was either on a public thoroughfare or in a parking lot other than the dance studio's parking lot. When Wal-

don was observed near Methodist Hospital, he was on the sidewalk.

In all but two instances, no eye contact between Majors and Waldon occurred. Given the lack of eye contact, it is possible that Waldon did not see Majors even though she saw him. Four out of the six times Majors observed Waldon, Majors was driving her car. In describing three of those instances, Majors testified that she felt safe in her car. In none of the instances did Waldon make a verbal threat, a physical threat, or even an obscene gesture.

"Stalking" is defined by statute as:

a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened.

Ind.Code § 35–45–10–1.[1] "Harassment" is defined as:

conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress.

Ind.Code § 35–45–10–2.[2] "Impermissible contact" includes, but is not limited to, knowingly or intentionally following or pursuing the victim. Ind.Code § 35–45–10–3.

In this case, there was no evidence to support a finding that Waldon intended to harass Majors. Six sightings of an ex-husband in public places during a one-year period do not amount to harassment. There is nothing in the record which would indicate that the six times Majors observed Waldon were anything but chance or coincidental encounters. In three of those encounters, there is no evidence that Waldon even realized he was involved in an encounter. While an individual might dislike a former spouse or might be afraid to be in the vicinity of a

former spouse, that person's subjective reasons for wishing that the former spouse be elsewhere cannot transform the former spouse's innocent activities into behavior sufficient to support a criminal conviction.

In *Leuteritz v. State*, 534 N.E.2d 265 (Ind. Ct.App.1989), Leuteritz was convicted of the offense of harassment based on one telephone call to his former employer's residence. When the former employer's wife answered the telephone, Leuteritz said "I would like to speak to Diaper Rash Face Charlie." *Id.* at 266. The former employer's wife told Leuteritz to stop calling and the conversation ended. This court reversed Leuteritz's conviction, finding the evidence insufficient to prove that Leuteritz had no intent of legitimate communication, an element of the offense of harassment. *Id.* at 267. This court noted that intent cannot be inferred from the subjective perception of the complainant, or be dependent on each complainant's sensitivity and individual reaction. *Id.* at 266–67. Instead, the standard must be that of a reasonable person.

Here, the encounters between Majors and Waldon were personally upsetting to Majors; they made her upset and fearful. However, there is nothing about the encounters which could make a reasonable person feel harassed, absent some preconceived idea concerning Waldon's intentions. While Waldon's presence in places Majors frequented may have been frightening to her, Majors' fear cannot form the basis for a determination that Waldon entertained the intent to harass Majors.

Three Indiana cases interpreting the current stalking statute emphasize this point. In *Burton v. State*, 665 N.E.2d 924 (Ind.Ct. App.1996), Burton made several telephone calls to the victim, leaving messages such as: "Hi whore," "REDRUM", "I hope you have the f——ing windows secured," and "I am coming in the morning." Burton was also seen outside the victim's house. From this behavior a reasonable person could conclude

---

1. Specifically excluded from the definition of stalking is statutorily or constitutionally protected activity. I.C. § 35–45–10–1.

2. "Harassment does not include statutorily or constitutionally protected activity such as lawful picketing pursuant to labor disputes or lawful employer-related activities pursuant to labor disputes." I.C. § 35–45–10–1.

that Burton entertained the intent to harass the victim.

In *Hendricks v. State,* 649 N.E.2d 1050 (Ind.Ct.App.1995), Hendricks was enamored with a thirteen-year-old girl who did not share his passion. Hendricks threatened the girl, attempted to pay others to assault her, repeatedly telephoned her home and would stand outside her home with a baseball bat and stare. This type of activity by Hendricks could lead a reasonable person to conclude that Hendricks entertained the intent to harass the victim.

In *Johnson v. State,* 648 N.E.2d 666 (Ind. Ct.App.1995), Johnson came to Indianapolis searching for the victim, who had fled from Johnson several times previously and was secluded at a shelter to avoid Johnson. He harassed people outside the shelter on two occasions while attempting to gather information on the victim. He also appeared beside her when she went to the prosecutor's office for help, and even though she indicated she did not wish to speak with him he continued to whisper to her turned back. A reasonable person examining Johnson's conduct could find that he entertained the intent to harass the victim.

In all of these cases, an examination of the defendant's actions alone, without consideration of the victim's subjective perceptions, could lead a reasonable person to the conclusion that the defendant entertained the intent to harass. That is not true in the case before us. Waldon's actions evince no intent to harass when viewed without considering Major's subjective perception. For this reason, the evidence is insufficient to sustain Waldon's stalking conviction. I would reverse with instructions to enter a judgment of not guilty.